IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF IOWA
CENTRAL DIVISION

| | |
|---|---|
| OUTCOMES PHARMACEUTICAL HEALTH CARE, L.C., <br><br> Plaintiff, <br><br> vs. <br><br> NATIONAL COMMUNITY PHARMACISTS ASSOCIATION; COMMUNITY CARE RX, L.L.C.; and COMMUNITY MTM, L.L.C., <br><br> Defendants. | **No. 4:05-cv-00682-JEG** <br><br><br> **ORDER ON MOTION FOR PRELIMINARY INJUNCTION** |

This matter is before the Court on Plaintiff's Motion for Preliminary Injunction, which the Defendants resist. Hearing was held on the matter on December 12 through December 14, 2006. Plaintiff was represented by attorneys Michael Dee and Camille Urban. Defendants were represented by attorney Allen Farber. The matter is now fully submitted for review.

## BACKGROUND AND SUMMARY OF MATERIAL FACTS[1]

On January 1, 2006, the Medicare Prescription Drug, Improvement, and Modernization Act of 2003 ("MMA") took effect. This prescription drug plan, known as Medicare Part D, added the first voluntary prescription drug benefit under Medicare. S. Rep. No. 109-48, at 20 (2005). This voluntary drug benefit is intended to reduce prescription drug care costs for the elderly and individuals with disabilities.

Plan D benefits are not provided directly through the Centers for Medicare and Medicaid Services ("CMS"), but instead, CMS contracts with Part D sponsors who provide the benefits. A

---

[1] As this proceeding in connection with an application for preliminary injunction arises early in this litigation, the Court's factual findings are based upon the current record and are made for purposes of the current motion only.

Part D sponsor is a private entity that has been certified by CMS to provide a prescription drug plan.  42 C.F.R. § 423.882.  "Each Part D sponsor must have established, for covered Part D drugs furnished though a Part D plan, a drug utilization management program, quality assurance measure and systems, and [a medication therapy management program] . . ."  42 U.S.C. § 423.153(a).

Because the MMA was signed into law in 2003, yet did not take effect until January 1, 2006, included in the MMA was a transitional prescription drug benefit which established a prescription drug discount card program.  42 U.S.C. § 1395w-141(a)(1)(A).  The intent that the drug discount card program was to be transitional in nature pending the January 1, 2006, effective date of the Part D prescription plan is evidenced by the implementation and termination deadlines for the drug discount card program that were included in the statute.  42 U.S.C. § 1395w-141(a)(2).

Plaintiff Outcomes Pharmaceutical Health Care, L.C. ("Outcomes"), is in the business of providing medication therapy management services ("MTM services") to clients who consist primarily of healthcare plan providers of various Medicare programs.

MTM services are essentially a method of facilitating patients' use of their medication in order to assist them in getting the most out of their medication.  Examples of MTM services include a pharmacist making sure a patient is not missing doses of their medication, explaining to a patient the directions on the medication's label, or educating a patient about proper use of medication.  There are four methods for providing MTM services:  face-to-face interactions between the patient and the pharmacist, contacting a patient via direct mail, phone call centers that place unsolicited phone calls to patients, and by faxing to patients information that is

relevant to the use of medication.  Outcomes utilizes the face-to-face method.  CMS does not require one method over another.

Thomas Halterman, Outcomes' CEO, testified that Patty Kumbera and he, along with approximately eight other people, founded Outcomes in January of 1999 in order to provide medication management services to consumers in order to assist them in making the best use of their medication.[2]  Outcomes began using the term "Encounter" in connection with its MTM services in 1999 in order to label certain components of the Outcomes system and in marketing the Outcomes System to plan providers.  Halterman testified that after considering other terms such as "The Pharmaceutical Care Program" or "Cognitive Service Program", they ultimately chose the term "Encounter" in 1999, and Kumbera testified that they selected this term at a time when the term was not commonly used in the medical industry to describe a patient/pharmacist meeting.  Outcomes also uses the term "Encounter" to market the Outcomes system to pharmacists and the term appears on claim forms and on Outcomes' website.  The term is also used in training materials and during training sessions with pharmacists.  Outcomes asserts that during the term of the Agreement between itself and CCRX, its "Encounter" branded materials were used when dealing with pharmacists for the benefit of CCRX.

Defendant National Community Pharmacists Association ("NCPA") is a not-for profit corporation.  Defendant Community Care Rx ("CCRX") is a wholly-owned subsidary of NCPA and is a collaborative venture between NCPA, MemberHealth, Inc. ("MemberHealth"), and Computer Sciences Corporation ("CSC").  CCRX was formed to offer an alternative pharmacy benefit management solution in the United States healthcare market.  Defendant Community

---

[2] Such services later became termed "Medication Therapy Management" services when they were labeled as such in the Code of Federal Regulations.

3

MTM provides a web-based system to facilitate the provision of MTM services by community pharmacists.  MemberHealth is a prescription benefit management company as well as a national Medicare Part D prescription drug plan sponsor with approximately 1.1-million members who have enrolled in its Medicare Part D plans.

On October 6, 2004, Outcomes and CCRX entered into a Medication Therapy Management Services Agreement (the "Agreement"), such Agreement being executed by Bruce Roberts ("Roberts"), Vice-President and CEO of NCPA and chairman of the board of CCRX, and Thomas Halterman ("Halterman"),  CEO of Outcomes.  Under the terms of this one-year Agreement, Outcomes was to provide CCRX with MTM services in connection with CCRX's Medicare prescription drug discount card and transitional assistance program.  Under the terms of the Agreement, such MTM services included prescriber consultations, patient compliance consultations, patient education and monitoring, comprehensive medication review, QTC consultations, prescriber refusals, and patient refusals.  The Agreement contained a confidentiality clause which stated that certain proprietary information belonging to Outcomes was to be held confidential by CCRX throughout the term of the Agreement and extending past the termination of the Agreement.

Outcomes began submitting Group Monthly Reports to CCRX during the course of the Agreement.  These Group Monthly Reports gave a summary of the services that were provided under the Agreement for a given month.  Halterman testified that the Group Monthly Reports were part of the Outcomes system provided under the Agreement, because they were part of the reporting and analysis provided to CCRX, and that these reports included information about monthly claims on a cumulative basis.

Final regulations regarding administration of Plan D benefits were published by the CMS on January 28, 2005. 70 Fed. Reg. 4193 (January 28, 2005) (codified at 42 C.F.R. § 423). In February of 2005, Roberts invited Patty Kumbera ("Kumbera"), Outcomes' Chief Operating Officer, to speak about Outcomes' MTM program at an NCPA conference that was to be held in St. Thomas. Charles Hallberg ("Hallberg"), CEO of MemberHealth, would also be in attendance at the NCPA conference in St. Thomas.

Kumbera testified at the motion hearing that while in St. Thomas, she discussed with Roberts and Hallberg the new Medicare Part D program. Kumbera testified Hallberg explained that MemberHealth was interested in participating in the design of an MTM solution that would limit its focus to Part D drug benefits, particularly the minimization of spending on inappropriate drugs and maximizing compliance with appropriate drugs. Hallberg stated in his declaration that Kumbera listened to Hallberg's concerns but was ultimately not willing to modify Outcomes' product to meet MemberHealth's needs. Kumbera testified she indicated at the St. Thomas meeting that Outcomes would be flexible but would not focus solely on the reduction of drug spending. Hallberg's declaration states that he informed Kumbera at this meeting that Outcomes' program was of no interest to MemberHealth. Roberts testified at the hearing that MemberHealth informed him during February of 2005 that Outcomes would not be its provider for MTM services, and thus Roberts knew as early as February of 2005 that CCRX would not be able to use Outcomes to provide MTM services to MemberHealth.[3]

Kumbera testified that sometime either at the end of March or perhaps in April, Scott Hughes, who worked for MemberHealth, informed her that consideration was being given to

---

[3] Roberts testified he continued to look for services Outcomes might provide but did not further explain the nature of any such services.

building and creating for CCRX its own MTM system.  Kumbera stated that she asked Roberts

about this, and he denied it was true.

On March 8, 2005, Halterman and Kumbera met with Roberts and Tim Jones, Vice-

President of Operations at CCRX ("Jones"), to discuss MTM services for CCRX's 2006 Plan D

program.  Jones ultimately asked Halterman and Kumbera for a written proposal and pricing

regarding what Outcomes thought it would take to provide MTM services for CCRX.  A pro-

posal was drafted by Outcomes and sent to Jones.

After receiving the written proposal, Jones scheduled a conference call which included

David Weinstein, an independent contractor for CCRX, and Sharman Stephens, also a consultant

working with CCRX.[4]  Defendants assert that CCRX had several concerns with the efficacy of

Outcomes' MTM services for CCRX's drug discount card program, such as its low adoption and

utilization rates, and how these concerns would translate into the Part D program.  Outcomes

was asked by CCRX to address these concerns and modify its product to meet the needs of

CCRX for its Part D program.

During this conference call, Outcomes suggested to CCRX that an alternative to

Outcomes managing all MTM services on behalf of CCRX would be a platform only, or "back

room" procedure, in which CCRX would operate and manage its own MTM program and

essentially rent Outcomes' electronic messaging system and claims platform.  Two meetings

were scheduled for May 2 and 3 to discuss this "back room" concept.  Halterman testified that

---

[4] Specifically, Weinstein states in his declaration that he was hired to provide business
consulting services to further develop CCRX's Medicare business in preparation for the
Medicare Part D program to become effective in January 2006.  Stephens testified she was hired
to provide consulting services regarding the content and protocol necessary to comply with the
Part D regulations.

the May 2 meeting was actually scheduled as a dinner and was intended to be a meet-and-greet

gathering, and that the May 3 meeting was to be the meeting where in-depth discussions

regarding the back room concept would occur.  In preparation for the May meetings, Weinstein

requested a rate sheet detailing the pricing of the "back room" strategy, as well as the other

strategies Outcomes had proposed over the course of prior weeks.  Weinstein testified that in

order to evaluate Outcomes as a Part D vendor, they needed to know what Outcomes would be

providing and how much it would cost.  Halterman emailed Jones the requested information on

April 29 and specifically stated, "Please feel free to share this with David or Sharman provided

they understand they are working as an agent of CCRx and therefore bound to the confidentiality

clauses of the Outcomes-CCRx agreement."  The record contains no indication anyone disputed

Halterman's limitation.

Halterman, Kumbera, Stephens, Weinstein, and Jones met for dinner at a Washington,

D.C., restaurant on May 2, 2005, as planned.  Defendants contend that before this meeting,

Outcomes had been advised by CCRX that Outcomes' current product would not meet the needs

for CCRX's Part D plan unless it could increase utilization of pharmacists and guarantee savings

on drug spending.  Defendants contend the meeting was held to provide Outcomes the oppor-

tunity to explain what it would be offering through its product, what the cost to CCRX would be,

and whether Outcomes would guarantee drug savings.

Both Halterman and Kumbera testified that at the May 2, 2005, dinner, Weinstein pulled

out the rate sheet that had been provided to Jones on April 29 and indicated he had a number of

questions regarding the rate sheet and pricing that had been provided by Outcomes.  Halterman

and Kumbera testified that during the meeting, Weinstein, Jones, and Stephens asked detailed

questions about Outcomes' administrative practices, MTM service coverage, quality assurance

7

procedures, support practices, and pricing, and that Weinstein took copious notes during the meeting.  Weinstein and Stephens do not recall, but cannot dispute, Plaintiff's description of the meeting.  Stephens testified she thought the purpose of the meeting was to discuss what Outcomes was offering; Weinstein testified that the purpose of the meeting was to address the concerns CCRX had brought up regarding drug spending and the lack of utilization of the MTM services.

Halterman testified that during the dinner meeting, he explained that Outcomes was developing a new product that would "push" case interventions to pharmacists, as opposed to the existing Outcomes system relying on the pharmacists to initiate action, which is referred to as a "pull" system.  Halterman referred to this new product as "vaporware", meaning it had not yet been fully developed, built, or implemented.  Kumbera then interjected that their "push" product was more than vaporware because it wouldn't take long for them to pull the trigger on completing a final product.  Halterman and Kumbera testified that Weinstein indicated at the conclusion of the meeting that he had enough information to proceed and suggested the May 3 meeting be cancelled.  Defendants state that the meeting was cancelled because, based upon the information gleaned from the dinner meeting, it had been determined that the services offered by Outcomes would not meet the needs of CCRX's Part D program and thus would not work for CCRX.  Weinstein was asked by Kumbera whether Outcomes was going to be CCRX's MTM provider for 2006, and Weinstein indicated that Outcomes was one of some vendors they were considering.  Outcomes later learned that CCRX had not met with any other vendors.

On May 3, 2006, CCRX submitted a draft budget to MemberHealth, who was the prospective customer for the CCRX Part D MTM services.  Weinstein testified that he likely began working on this draft budget in April of 2005.  In this draft budget, Weinstein included

two "per member per month"("PMPM") rates that had been listed in Outcomes' rate sheet as part of Outcomes' "back room" proposal to CCRX for Part D Services.  Weinstein testified that these two numbers were used solely as placeholders because at the time of preparing the budget, he did not know what those numbers should be.  The budget proposal notes these numbers are the "largest quote I have" and therefore reflect the Outcomes experience in projecting budget expectations.  Weinstein testified that these numbers were never intended to be permanent.

Ultimately, MemberHealth reports that it never read beyond the first page of the CCRX draft budget because the first page indicated that the total amount CCRX would be seeking from MemberHealth exceeded the amount allotted for MTM services contained in MemberHealth's bid to CMS.  MemberHealth inflexibly advised CCRX it would only be spending $1.00 PMPM, and that CCRX was to submit a new draft budget incorporating this dollar amount.  Defendants submit that Hallberg took a "take it or leave it" position with regard to the $1.00 PMPM.

Sonja Cary ("Cary") began working with Defendants in June.  Cary was hired to recruit and manage a development team and to conduct a build-versus-buy analysis with regard to MTM services.  Cary testified that Defendants conducted a build/buy analysis in June through July of 2005.  After conducting the build/buy analysis, NCPA ultimately decided to build its own MTM platform to comply with Part D requirements, and Cary was tasked with writing the computer code for the internet based system.  This intent was confirmed to Outcomes in a July 8, 2005, email from Roberts to Kumbera in which Roberts wrote, "Word on the street is correct . . . we are developing our own web based solution.  That has been the intent from the beginning."[5]  In

---

[5] Roberts contended in hearing testimony that this statement was made in anger, sent without reflection, and was inaccurate.  Thus, this explanation must be ultimately reconciled with the email document.

an August 2005 conference call, Outcomes was informed that Outcomes was not going to provide MTM services for CCRX in 2006.

After working out the finer contractual details, in October of 2005, MemberHealth and CCRX entered into an agreement in which CCRX would provide MemberHealth's Part D MTM services. The program was fully rolled out to all eligible MemberHealth members on approximately July 1, 2006.

Outcomes asserts that it recently discovered that as early as May of 2006, Community MTM and CCRX were conducting training seminars for pharmacists and using the mark "Encounter" on training materials and during these seminars. The mark "Encounter" can also be found on the Community MTM website identifying a set of protocols. Outcomes contends that CCRX uses the mark "Encounter" for use with its forms, system, training, and marketing materials associated with facilitating CCRX's provision of MTM services, citing such examples of CCRX's use such as use in CCRX's "Encounter Preparation Guide", "Encounter Guide", "CCRX Encounter Guide", and "Encounter Materials".

On December 6, 2005, Outcomes filed a Petition and Demand for Jury Trial in the Iowa District Court for Polk County, listing NCPA, CCRX, and Community MTM services, among others, as defendants. In this petition, Outcomes asserted claims of breach of contract, misappropriation of trade secrets, intentional interference with prospective business advantage, conspiracy, and respondeat superior. On December 12, 2005, Roberts provided Outcomes with notice that CCRX would be terminating the Agreement, with a final termination date of February 6, 2006.

On December 20, 2005, Defendants removed the action from the Iowa District Court for Polk County to this court based on diversity jurisdiction. On January 24, 2006, Outcomes filed a

10

Motion for Preliminary Injunction.  On January 31, 2006, the time in which to file a response to the Motion for Preliminary Injunction was extended until further order of the Court, or until a response was filed, whichever event occurred first.  This was done because the parties desired to conduct some discovery prior to setting a briefing schedule or scheduling a hearing on Outcomes' Motion for Preliminary Injunction.  On June 6, 2006, the parties filed a status report with the Court, indicating they were ready to proceed with setting a briefing schedule and hearing date.  On June 22, the Court set a briefing schedule and a tentative hearing date.

On August 25, 2006, Outcomes filed a Third Amended Complaint and an Amended Motion for Preliminary Injunction.  The Third Amended Complaint asserts claims of breach of contract, misappropriation of trade secrets, intentional interference with prospective business advantage, federal trademark infringement, unfair competition, and common law trade-mark infringement.

In the Amended Motion for Preliminary Injunction, Outcomes claims CCRX, NCPA, and/or Community MTM, through their employees, agents, servants and/or independent con-tractors are using certain confidential and proprietary information belonging to Outcomes to develop a competing medication therapy management system.  Outcomes asserts it will suffer immediate and irreparable harm if the Defendants are allowed to continue to use such propriety and confidential  information.  Outcomes further asserts that CCRX and Community MTM are using the mark "Encounter" on marketing materials, training guides, and forms in association with facilitating MTM services, a mark which Outcomes claims it has been using since at least 1999.  Outcomes contends that CCRX and Community MTM's use of the "Encounter" mark constitutes trademark infringement.  Outcomes requests the Court enter a preliminary injunction restraining the Defendants from using and/or disclosing Outcomes' confidential information and

from using the mark "Encounter" or any confusingly similar term in connection with advertising, promoting, or providing services to facilitate MTM services.

Defendants resist the Amended Motion for Preliminary Injunction.  Defendants maintain that Outcomes cannot succeed on the merits of its breach of contract or trade secret claims and that no threat of irreparable harms exists if a preliminary injunction is not granted.  Defendants further argue that the balance of harms weighs in favor of denying the motion and that the public interest is best served by a denial.  Defendants make similar arguments with respect to the trade-mark infringement and unfair competition claims.

## PRELIMINARY INJUNCTION STANDARD

Plaintiff's preliminary injunction motion is made pursuant to Fed. R. Civ. P. 65.

> In deciding a motion for a preliminary injunction, a district court balances four factors: (1) the likelihood of the movant's success on the merits; (2) the threat of irreparable harm to the movant in the absence of relief; (3) the balance between that harm and the harm that the relief would cause to the other litigants; and (4) the public interest.

Watkins Inc. v. Lewis, 346 F.3d 841, 844 (8th Cir. 2003) (citing Dataphase Sys., Inc. v. CL Sys., Inc., 640 F.2d 109, 114 (8th Cir. 1981)).  "A preliminary injunction is an extraordinary remedy, and the burden of establishing the propriety of an injunction is on the movant."  Id.

## ANALYSIS OF THE PRELIMINARY INUNCTION FACTORS

## BREACH OF CONTRACT AND MISAPPROPRIATION OF TRADE SECRETS.

**I.      Likelihood of Success on The Merits.**

**A.      Breach of Contract.**

The analysis begins with the question of Outcomes' probability of success on the merits.

> In a breach-of-contract claim, the complaining party must prove: (1) the existence of a contract; (2) the terms and conditions of the contract; (3) that it has performed all the terms and conditions required under the contract;

(4) the defendant's breach of the contract in some particular way; and

(5) that plaintiff has suffered damages as a result of the breach.

Molo Oil Co. v. River City Ford Truck Sales, Inc., 578 N.W.2d 222, 224 (Iowa 1998).

**1.    The Existence of a Contract.**

Neither party disputes the existence of the Medication Therapy Management Services

Agreement, which was entered into on October 6, 2004, and which had a term of one year.

**2.    The Terms and Conditions of the Contract.**

The Court examines the plain language of the MTM Agreement.  The MTM Agreement

contained the following sections regarding confidentiality:

9.1   Proprietary Nature of the Outcomes System

> The Client acknowledges that the Outcomes System (including, without
> limitation, the services and all rights associated with trade secrets,
> copyrights, trade names, service marks and trademarks related thereto)
> constitute valuable proprietary assets of Outcomes, and that this
> Agreement shall not and does not provide the Client with any
> ownership interest therein, whether as a license or otherwise.  The
> Client and their respective employees, agents and representatives shall
> hold all of such information and material in confidence and shall not
> use or reveal any such information and material to any other person or
> entity except for any use explicitly authorized hereunder during the
> Term of this Agreement.

9.2   Equitable Relief

> The Client acknowledges the value of Outcomes' proprietary rights and
> the irreparable injury that would result from violation of the provisions
> of Section 9.1.  Accordingly, the Client agrees that Outcomes shall be
> entitled to injunctive or other equitable relief to prevent the threatened
> or further actual breach of Section 9.1.  Promptly upon the termination
> of this Agreement, the Client shall return to Outcomes all of Outcomes'
> proprietary information and materials and all copies of such informa-
> tion and materials, if any, in its possession.  Sections 9.1 and 9.2 shall
> survive the termination of this Agreement with respect to any of
> Outcomes proprietary information and proprietary material disclosed to
> the Client prior to the date of termination.

Defendants contend that this confidentiality clause is both unduly vague and over-broad. Outcomes asserts that the clause clearly covers all information passed between itself and Defendants.  Clearly, the parties contracted for confidentiality of at least some of the information Outcomes was providing to Defendants.  Whether the specific materials at issue were covered by the Agreement will be discussed below.

### 3.   Performance of all the Terms and Conditions.

Neither party disputes that other than Outcomes' allegation regarding the breach of the non-disclosure clause, all terms and conditions required under the contract were performed.

### 4.   Defendants' Breach of the Contract in Some Particular Way.

In arguing that a breach has occurred, Outcomes essentially refers to the confidential nature of the rate sheet and Group Monthly Reports, and the fact that significant amounts of information regarding Outcomes' product was passed to CCRX.  Based upon CCRX's exposure and access to this information, and the fact that CCRX later set up its own competing product, Outcomes argues Defendants must have breached the Agreement by inappropriately disseminating this information and using this information when creating its own MTM product, thus violating the confidentiality clause.  At hearing, both Halterman and Kumbera explained that if an entity had both the Group Monthly Reports and a copy of the rate sheet, they could extrapolate various data from comparing the documents to one another.  Kumbera testified that if a competitor had a copy of these documents, they would know Outcomes' costs and how Outcomes priced their product, what to expect in market reaction, and would therefore be able to undercut Outcomes' rate.

Defendants contend that the Group Monthly Reports were not protected by the confidentiality provisions of the Agreement because they were not part of the Outcomes System

defined in paragraph 1.9 for the prescription drug discount card, and similarly that because the rate sheet pertained to MTM services, and not the discount drug card program covered by the Agreement, the rate sheet also was not covered by the Agreement.  Outcomes argues the Group Monthly Reports were provided pursuant to their general obligation under the Agreement to provide reports, and that the later MTM services would evolve as a modification to the Agreement, thus incorporating the providing of the rate sheet.

Defendants further argue that the documents at issue have lost trade secret status because Outcomes has made the information generally available.  Outcomes asserts that while it did share parts of its pricing and operational data with other entities that were not subject to non-disclosure agreements, it never gave any one entity all of the information contained in these materials.  Kumbera and Halterman both testified that CCRX was the only entity to which it had given the rate sheet and pricing information in its entirety, and Halterman stated that had Defendants objected to his reference to the confidentiality provision in his April 29, 2006, email,[6] he would not have provided the rate sheet.  Further, Outcomes argues it has never provided Group Monthly Report information in a sequence that would have allowed a reader to discern trends.

Defendants point out that its MTM product is significantly different from the then-existing Outcomes system, because the Community MTM platform is a "push" system, which automatically forwards cases to a pharmacist for his or her attention, whereas Outcomes utilized a "pull" system, in which pharmacists choose to use it on particular cases.  There is no dispute

---

[6] Halterman forwarded the rate sheet information to Tim Jones of CCRX with a cover email specifically providing, "Please feel free to share this with David [Weinstein] or Sharman [Stephens] provided they understand they are working as an agent of CCRx and therefore bound to the confidentiality clauses of the Outcomes-CCRx agreement."  Pl.'s Ex. R at p. D000468.  There is no evidence of any disagreement with this restriction, nor with its reference to the applicability of the Agreement.

that Outcomes had discussed with Defendants the utilization of a "push" system, but as noted by all involved, Outcomes' "push" system was still in the developmental phase and was not market ready until August of 2005.  While discussions regarding a push system took place, Halterman testified that CCRX never indicated that they wanted a push program.

The record reveals two specific instances of CCRX disclosure of Outcomes' information to a third party, namely, Weinstein's use of the two PMPM's in the first draft budget CCRX submitted to MemberHealth.  MemberHealth states that it never saw these two PMPM's, as it never went beyond the summary contained on the first page of the budget due to the initial fiscal proposal, which was in excess of the bid MemberHealth had submitted to CMS as part of its application to become a Part D sponsor.

While Outcomes argues access to this confidential information would allow a competitor to undercut Outcomes in the marketplace, Outcomes reports that Outcomes' PMPM for the same number of lives is less than half of the PMPM CCRX is currently charging MemberHealth.  In addition, CCRX went with a "push" platform instead of Outcomes' "pull" platform, thus CCRX must have developed the push platform independent of any knowledge regarding Outcomes' push program, as Outcomes' push program was only in the developmental stages when CCRX was marketing its own push program to Member Health.  Further, the pricing contained in the rate sheet pertained to a pull system, not the costs for a push system.  Outcomes never provided Defendants with pricing for a push system, and Weinstein denied that Defendants used or caused to be used any of Outcomes' information during the creation and development of CCRX's MTM program.  At this stage of the proceedings, while recognizing the use of the two PMPM's in the draft budget and assuming the information was confidential, it is difficult to discern any signifi-cant use of confidential information.

16

**5.   Damages Suffered by Outcomes.**

The damages Outcomes contends it has suffered is damage to its competitive standing, loss of customers, potential customers, and customer goodwill, in essence the same damages asserted in support of its assertion that is has and will continue to suffer irreparable harm, as discussed below.

**B.    Misappropriation of Trade Secrets.**

Outcomes claims there are two trade secrets Defendants have usurped:  the Group Monthly Reports and the rate sheet that was provided to Jones by Halterman on April 29, 2005.

> "Trade secret" means information, including but not limited to a formula, pattern, compilation, program, device, method, technique, or process that is both of the following:
>
>   a.   Derives independent economic value, actual or potential, from not being generally known to, and not being readily ascertainable by proper means by a person able to obtain economic value from its disclosure or use.
>
>   b.   Is the subject of efforts that are reasonable under the circumstances to maintain its secrecy.

Iowa Code § 550.2(4).

Outcomes asserts the Group Monthly Reports and the information contained in the rate sheet are trade secrets.  Defendants assert that Outcomes' pricing is not a trade secret, and Outcomes freely published its pricing information to prospective clients.  Defendants claim that Outcomes gave CCRX the Group Monthly Reports to promote the Outcomes product, and that Outcomes encouraged CCRX to disclose the Group Monthly Reports to help market and pro-mote Outcomes' product.  Defendants also note that various proposals that Outcomes sent to other prospective clients included pricing information.  Outcomes asserts that while it may have

provided pricing information to other prospective clients, it was in the nature of "snapshot" indications and did not include information regarding what the administrative costs would be.

"Business information may be considered a trade secret, including customer lists, sources of supplies, confidential costs, and price data." Business Designs, Inc. v. Midnational Graphics, L.L.C., 2002 WL 987971, *2 (Iowa App. 2002) (citing U.S. West Commc'ns, Inc. v. Office of Consumer Advocate, 498 N.W.2d 711, 714 (Iowa 1993)).  "[I]nformation kept secret that would be useful to a competitor and require cost, time and effort to duplicate is of economic value." U.S. West, 498 N.W.2d at 714.

Halterman testified that he expected Defendants to establish firewalls between the different companies in order to protect Outcomes' confidential information.  There were no such firewalls.  Kumbera, however, testified that she thought NCPA, MemberHealth, and CSC were all equity partners in CCRX, and that when she provided information to  Hughes at MemberHealth, she assumed and expected that information would go to CCRX and NCPA, and that when she provided information to CCRX, she expected that information to go to NCPA and to MemberHealth, all entities being one and the same.

Kumbera testified that no Outcomes employees or interns sign non-disclosure agreements regarding Outcomes' proprietary information and that there is no employee manual pertaining to the confidentiality of Outcomes' information.  Kumbera testified that she often gives public presentations that include the disclosure of various parts of the Outcomes system and snapshots of the economics but that she never discloses the entirety of their program at any one presentation. Kumbera did concede that if a person were to follow her throughout time and attend every presentation she gave, they would be able to collect the different pieces of information she discloses at each one.

On the current record, it is a close call regarding whether the PMPM's constituted trade secrets.  While it does constitute pricing information that has an independent economic value from not being readily ascertainable, the reasonableness of the efforts undertaken to protect the secrecy of the PMPM's is questionable.  The Court is not entirely convinced on the current record that the Group Monthly Reports constitute trade secrets; however, such a determination is ultimately not necessary for the purposes of the present motion as there is no evidence that the Group Monthly Reports and the information contained therein was ever improperly disclosed or used.

Assuming Outcomes could establish the PMPM's constituted trade secrets, the Court must next consider whether the PMPM's were misappropriated.

Iowa Code § 550.2(3) defines misappropriation as doing any one of the following:

a. Acquisition of a trade secret by a person who knows that the trade secret is acquired by improper means.

b. Disclosure or use of a trade secret by a person who uses improper means to acquire the trade secret.

c. Disclosure or use of a trade secret by a person who at the time of disclosure or use, knows that the trade secret is derived from or through a person who had utilized improper means to acquire the trade secret.

d. Disclosure or use of a trade secret by a person who at the time of disclosure or use knows that the trade secret is acquired under circumstances giving rise to a duty to maintain its secrecy or limit its use.

e. Disclosure or use of a trade secret by a person who at the time of disclosure or use knows that the trade secret is derived from or through a person who owes a duty to maintain the trade secret's secrecy or limit its use.

f. Disclosure or use of a trade secret by a person who, before a material change in the person's position, knows that the information is a trade secret and that the trade secret has been acquired by accident or mistake.

Iowa Code § 550.2(3).  Outcomes asserts that Weinstein, via the reference to the confidentiality provision contained in the April 29, 2005, email from Halterman, and as a consultant for one or

more of these Defendants, was under a duty to maintain the secrecy of the PMPM's.  By

including the two PMPM's in the proposed budget to MemberHealth, Outcomes argues that

Weinstein disclosed this trade secret to MemberHealth and thereby misappropriated the infor-

mation.  Weinstein testified that he did not recall reading the email from Jones regarding the rate

sheet being subject to confidentiality but does not dispute he received the communication.  The

email from Halterman to Jones specifically referenced the confidential nature of the rate sheet,

and this email was forwarded to Weinstein.  Although Weinstein testified he did not recall the

reference to confidentiality regarding the rate sheet, clearly Halterman intended it to be subject

to confidentiality, as evidenced by his inclusion of a specific reference to confidentiality when

sending the rate sheet to Jones.

Defendants contend that in any event, there is no evidence that MemberHealth ever saw

the two PMPM's that Weinstein had included in the draft budget.  "[I]n making a claim for

misappropriation of a trade secret under the Iowa Uniform Trade Secrets Act, the plaintiff need

not show that the defendant actually used the secret."  White Pigeon Agency, Inc. v. Madden,

2001 WL 855366, *7 (Iowa App. 2001) (citing EFCO Corp. v. Symons Corp., 219 F.3d 734, 741

(8th Cir. 2000)).  "The extent to which the trade secret was actually employed by a defendant is

relevant in determining damages."  Id.

For purposes of the current motion, the Court finds it reasonable for a fact finder to con-

clude the Group Monthly Reports and the rate sheet were provided under the general terms of the

Agreement, and even more when considered in the context of the additional communications

regarding the confidential nature of the materials.  The documents also evidence the character of

trade secrets, and a reasonable fact finder could conclude their nature was not destroyed by the

disclosure of partial information in other settings.  At this juncture, the Court concludes

20

Weinstein used the information for some budgetary projection purposes; but, the Court need not

find a further specific use.  Based upon the current record, the Court concludes that Outcomes

has established some likelihood of success on the merits of the misappropriation of trade secrets

claim.  Because the record lacks adequate proof of damages, the Court cannot conclude

Outcomes had demonstrated a likelihood of success on the breach of contract claim.

## II.     Irreparable Harm.

The second factor to consider in determining whether to issue a preliminary injunction is

the threat of irreparable harm to Outcomes.  "For a court to enter a preliminary injunction, it

must find that the moving party would be irreparably harmed absent an injunction."  Mid-

America Real Estate Co. v. Iowa Realty Co., Inc., 406 F.3d 969, 977 (8th Cir. 2005) (citing

United Healthcare Ins. Co. v. AdvancePCS, 316 F.3d 737, 740 (8th Cir. 2002)).  "Failure to

show irreparable harm is an independently sufficient ground upon which to deny a preliminary

injunction."  Watkins Inc., 346 F.3d at 844.

Outcomes asserts it will be irreparably harmed if its trade secrets are readily obtainable

by its competitors.  Outcomes claims the inevitable disclosure of its trade secrets, in breach of

the confidentiality clause, is imminent and irreparable harm because Outcomes' success is due at

least in part to the historical collection of data and careful analysis of the same.  Outcomes states

that once a virtual history of its own analysis is made instantly available, the three to five year

experience window between itself and a new competitor would be drastically shortened, if not

eliminated completely.

Defendants argue that Outcomes has not shown an imminent threat of certain and

substantial irreparable harm, asserting that Outcomes has provided no specifics to support its

allegations of threatened irreparable harm.  Defendants state that instead, Outcomes relies

21

entirely upon the assumption that Defendants have misused confidential and proprietary information, and the idea that any such disclosure or misuse threatens to cause irreparable harm. Defendants further argue that competition from Defendants on Part D services would at most cause only monetary harm to Outcomes.

Section 9.2 of the Agreement specifically states, "The Client acknowledges the value of Outcomes' proprietary rights and the irreparable injury that would result from violation of the provisions of Section 9.1.  Accordingly, the Client agrees that Outcomes shall be entitled to injunctive or other equitable relief to prevent the threatened or further actual breach of Section 9.1."  The Court is not bound by this provision of the Agreement, as a contractual provision cannot act as a substitute for a finding by the Court.

> While courts have given weight to parties' contractual statements regarding the nature of harm and attendant remedies that will arise as a result of a breach of a contract, they nonetheless characteristically hold that such statements alone are insufficient to support a finding of irreparable harm and an award of injunctive relief.  See, e.g., Smith, Bucklin & Assocs., Inc. v. Sonntag, 83 F.3d 476, 481 (D.C.Cir. 1996) ("Although there is a contractual provision that states that the company has suffered irreparable harm if the employee breaches the covenant and that the employee agrees to be preliminarily enjoined, this by itself is an insufficient prop."); Baker's Aid, [a Div. of M. Raubvogel Co., Inc. v.Hussman Foodservice Co., 830 F.2d 13, 16 (2d Cir. 1987)] ("contractual language declaring money damages inadequate in the event of a breach does not control the question of whether preliminary injunctive relief is appropriate"); Markovits v. Venture Info Capital, Inc., 129 F. Supp. 2d 647, 661 (S.D.N.Y. 2001) (provision in contract providing that breach would cause irreparable damage is merely one factor to be examined in making irreparable harm determination); Dice [v. Clinicorp, Inc., 887 F. Supp. 803, 810 (W.D. Pa. 1995)] (contractual provision cannot act as substitute for finding by court regarding injunctive relief); Firemen's Ins. Co. of Newark v. Keating, 753 F. Supp. 1146, 1154 (S.D.N.Y. 1990) ("it is clear that the parties to a contract cannot, by including certain language in that contract, create a right to injunctive relief where it would otherwise be inappropriate").

Dominion Video Satellite, Inc. v. Echostar Satellite Corp., 356 F.3d 1256, 1266 (10th Cir. 2004); see also Int'l Ass'n of Plumbing and Mechanical Officials v. Int'l Conference of Bldg. Officials, 1996 WL 117447, *2 (9th Cir. 1996) (district court committed error where it based its conclusion that irreparable harm existed solely on a contractual provision in which the parties conceded irreparable injury would exist in the event of a contract breach).  "Although such a provision may constitute evidence in support of a finding of irreparable harm, the mere inclusion of the contractual provision cannot act as a substitute for the requisite showing of irreparable harm." Dice, 887 F. Supp. at 810.

Bare allegations of what is likely to occur are insufficient to establish irreparable injury. Packard Elevator v. I.C.C., 782 F.2d 112, 115 (8th Cir. 1986).  Even accepting that the information contained in the rate sheet was covered by the confidentiality provision contained in the Agreement, Outcomes has produced no evidence to demonstrate they have lost any business, lost any revenue, or suffered any harm from the alleged breach and the alleged misappropriation of trade secrets.  Both Stephens and Cary testified that they did not use any information from Outcomes in developing the MTM program for CCRX.  Weinstein testified there was no use of the information beyond some incorporation in the preliminary budget, which Hallberg denies ever viewing, and that the information is not being disseminated or used for any other purpose. Roberts likewise denies any prior or threatened use.  Against this record, the Court must weigh the Plaintiff's concern of threatened use.  The record may suggest, but does not adequately support a finding, that Outcomes has suffered or otherwise faces immediate, irreparable harm. Outcomes has failed to establish it would be irreparably harmed in the absence of a preliminary injunction.

**III.     Balance of Harms.**

The third factor the Court must consider in determining whether to issue a preliminary injunction is the balance between the potential harm to Outcomes and the injury that granting the injunction will inflict on the other interested parties, otherwise known as the balance of harms. See Sports Design & Dev., Inc. v. Schoneboom, 871 F. Supp. 1158, 1165 (N.D. Iowa 1995). This element encompasses the determination of whether "the harm to the moving party out-weighs the financial loss and damage to the reputation of the nonmoving party." Aveda Corp. v. Evita Marketing, Inc., 706 F. Supp. 1419, 1431 (D. Minn. 1989) (citing Nat'l Bd. of YMCA v. Flint YMCA, 764 F.2d 199 (6th Cir. 1985)).  "This factor requires the Court to consider any possible harm to the defendant from granting a preliminary injunction and to balance it with the harm to the plaintiff if the plaintiff is denied preliminary relief, but is later successful on the merits." Minn. Mining & Mfg. Co. v. Rauh Rubber, Inc., 943 F. Supp. 1117, 1133 (D. Minn. 1996).

Outcomes argues that the balance of the harms is in its favor because it is facing immediate and irreparable harm to its business, on which it has spent many years building its reputation and goodwill.  Outcomes claims that if Defendants are allowed to continue their use and/or disclosure of Outcomes' confidential and proprietary information, all that Outcomes has achieved by virtue of its research and development will be lost overnight.

Defendants assert that the balance of harms weighs in their favor, as a preliminary injunction would effectively put CCRX and Community MTM out of business, lacerate Defendants' reputation and goodwill in the marketplace, and saddle NCPA with millions of dollars in lost investment.

24

Gary Smith, Senior Vice-President and Chief Financial Officer of NCPA, testified that if Defendants were enjoined from providing MTM services, CCRX would be in breach of its contract with MemberHealth, and as a result, MemberHealth would have grounds to terminate their contract with CCRX.  Smith further testified that MemberHealth is CCRX's only contract, and thus their only source of revenue.  If CCRX was enjoined from providing MTM to MemberHealth, Smith estimated that CCRX would be out of business within a matter of months due to a lack of revenue and fixed costs of over $800,000 per month.  In addition, because Community MTM's sole purpose is to facilitate the MTM services provided by CCRX, Community MTM would cease to exist.  In the absence of evidence to the contrary, this presents the Court with a dramatic impact upon the Defendants.  "The threat of being driven out of business is sufficient to establish irreparable harm."  American Passage Media Corp. v. Cass Commc'ns, Inc., 750 F.2d 1470, 1474 (9th Cir. 1985); see also Warren v. City of Athens, Ohio, 411 F.3d 697, 711 (6th Cir. 2005) ("Financial ruin, such as driving a company out of business, qualifies as irreparable harm.").  That concept is equally reasonable to both the party seeking an injunction and the party who would be enjoined.  While Outcomes has failed to establish irreparable harm, the harm a preliminary injunction would pose to CCRX and Community MTM appears immediate and real.  The Court therefore concludes the balance of harms weighs in favor of denying preliminary injunctive relief.

## IV.    Public Interest.

The final factor to consider in determining whether to issue a preliminary injunction is the public interest.

Outcomes asserts that where agreements are valid, the public interest calls for their enforcement, and additionally, assisting Outcomes in protecting its investment in development of

confidential and proprietary trade secret protected information that it uses to become a more profitable and efficient business is also in the public interest. Outcomes claims that failing to protect such confidential and proprietary business information leaves little, if any, incentive in the marketplace to create and invest in new and efficient business enterprises. Outcomes further asserts that a Plan D sponsor such as MemberHealth can amend how they provide their MTM services, thus while they wouldn't be able to use the face-to-face method if an injunction was granted, they could use one of the other three methods to deliver their MTM services.

Defendants argue that the public interest here unequivocally favors a denial of a preliminary injunction because an injunction could expose MemberHealth to CMS sanctions, including possible termination for breach of contract, and potentially expose MemberHealth's elderly members to health risks and even the possibility of a period of time without any pre-scription drug coverage. Defendants maintain the public interest in competition and promoting a broad range of consumer options also favors the denial of a preliminary injunction.

Currently, MemberHealth has approximately 1.1-million members enrolled in its Medicare Part D plans. Of those 1.1-million MemberHealth members enrolled in Medicare Part D, approximately 110,000 are eligible for the Part D MTM services. If CCRX were enjoined from providing MTM services, MemberHealth would be forced to find a new MTM provider or utilize a different MTM format on very short notice; and, while finding a replacement, MemberHealth would be in breach of its contract with CMS, which requires MemberHealth to have MTM services in place. In addition, the approximately 110,000 MemberHealth members who qualify for MTM services would be without MTM services until a replacement MTM service was procured. Exposing members of the public to the risk of being without MTM

26

services to which they are entitled under the MMA for any period of time is a significant public interest which weighs in favor of the denial of injunctive relief.

Additionally, there is a strong public interest in the lowest possible prices for a product, and the public interest in avoiding monopolies and encouraging competition.  Calvin Klein Cosmetics Corp. v. Lenox Labs., 815 F.2d 500, 505 (8th Cir. 1987).  Excluding CCRX and Community MTM from the marketplace via injunctive relief would leave Outcomes as the only broad-scale administrator of a comprehensive face-to-face MTM system in the United States. Outcomes would essentially have a monopoly in the market on this method of providing MTM services, in a market where services are of the utmost importance, prescription drug care.

There are significant and valid public policy arguments on both sides.  The Court concludes the public policy argument does not significantly favor any party.

**CONCLUSION.**

The Court concludes that other than the use of the two PMPM figures, which have no identifiable damages associated with their disclosure, Outcomes has failed to show anything more than a speculation that a breach of contract occurred.  The Court concludes that based upon the disclosure of the two PMPM numbers, Outcomes has established some likelihood of success on its misappropriation of trade secrets claim.  Outcomes has not established it will suffer irreparable harm, and the balance of harms and public interest factors weigh in favor of the denial of preliminary injunctive relief.  Upon careful consideration of all of the factors relevant to the issuance of a preliminary injunction, the Court concludes this extraordinary relief is not appropriate for the claims of breach of contract or misappropriation of trade secrets.

**TRADEMARK INFRINGEMENT AND UNFAIR COMPETITION.**

**I.      Likelihood of Success on the Merits.**

The Lanham Act[7] serves in part to protect persons engaged in commerce from unfair competition.  United Indus. Corp. v. Clorox Co., 140 F.3d 1175, 1179 (8th Cir. 1998).  To pre-vail under this Act, the plaintiff must prove the defendant's use of a name or mark "creates a likelihood of confusion, deception, or mistake among an appreciable number of ordinary buyers as to source" of the product or the association between the parties.  Duluth News-Tribune v. Mesabi Publ'g Co., 84 F.3d 1093, 1096 (8th Cir. 1996) (citing 115 U.S.C. § 1114(1), and General Mills, Inc. v. Kellogg Co., 824 F.2d 622, 626 (8th Cir. 1987); Microware Sys. Corp. v. Apple Computer, Inc., 126 F. Supp. 2d 1207, 1211 (S.D. Iowa 2000) (citations omitted).  To ulti-mately succeed on the merits of its trademark infringement and unfair competition claims, Outcomes would have to demonstrate that (1) its use of the term "Encounter" is entitled to

---

[7] Section 43(a) of the Lanham Act provides in pertinent part:

(a)(1) Any person who, on or in connection with any goods or services, or any container for goods, uses in commerce any word, term, name, symbol, or device, or any combination thereof, or any false designation of origin, false or misleading description of fact, or false or misleading representation of fact, which–

(A) is likely to cause confusion, or to cause mistake, or to deceive as to the affiliation, connection, or association of such person with another person, or as to the origin, sponsorship, or approval of his or her goods, services, or commercial activities by another person, or
(B) in commercial advertising or promotion, misrepresents the nature, characteristics, qualities, or geographic origin of his or her or another person's goods, services, or commercial activities,

shall be liable in a civil action by any person who believes that he or she is or is likely to be damaged by such act.

15 U.S.C. § 1125(a) (2000).

protection and (2) that CCRX's use of the "Encounter" term is likely to confuse consumers as to the source of the product.  See Hubbard Feeds, Inc. v. Animal Feed Supplement, Inc., 182 F.3d 598, 601 (8th Cir. 1999).  Outcomes does not need to show actual confusion or deceit; rather, it is enough to show the likelihood of confusion or deception.  David Sherman Corp. v. Heublein, Inc., 340 F.2d 377, 379 (8th Cir. 1965) (citations omitted).

**A.   Protectable Mark.**

"A term for which trademark protection is claimed will fall in one of four categories: (1) generic, (2) descriptive, (3) suggestive, or (4) arbitrary or fanciful."  WSM, Inc. v. Hilton, 724 F.2d 1320, 1325 (8th Cir. 1984).

> A generic mark refers to the common name or nature of an article, and is therefore not entitled to trademark protection.  Co-Rect Prods., Inc. v. Marvy! Adver. Photography, Inc., 780 F.2d 1324, 1329 (8th Cir. 1985).  A term is descriptive if it conveys an "immediate idea of the ingredients, qualities or characteristics of the goods," Stuart Hall Co., Inc. v. Ampad Corp., 51 F.3d 780, 785-86 (8th Cir. 1995) (internal quotations omitted), and is protectible only if shown to have acquired a secondary meaning.  Co-Rect Prods., 780 F.2d at 1329.  Suggestive marks, which require imagination, thought, and perception to reach a conclusion as to the nature of the goods, and arbitrary or fanciful marks, are entitled to protection regardless of whether they have acquired secondary meaning.

Frosty Treats Inc. v. Sony Computer Entm't America Inc., 426 F.3d 1001, 1005 (8th Cir. 2005).

The designation of a mark into one of these categories is important because, as explained by the Eighth Circuit,

> The standard of proof that must be met by the plaintiff in seeking injunctive relief varies depending upon the type of mark at issue.  If the mark is the strongest possible mark – an arbitrary or fanciful mark – it is "entitled to maximum legal protection and do[es] not require proof of secondary meaning."  If the mark is the weakest protectable mark – a descriptive trademark or trade name – the plaintiff must prove that the mark has an accepted "secondary meaning."

Cellular Sales, Inc. v. Mackay, 942 F.2d 483, 486 (8th Cir. 1991) (internal citations omitted). Distinctiveness is required for a mark to be eligible for protection.  Two Pesos, Inc. v. Taco Cabana, Inc., 505 U.S. 763, 769 (1992).  Distinctiveness may either be inherent or acquired.  Id. Marks in the trademark categories of arbitrary and fanciful or suggestive are distinct in and of themselves.  "Marks which are merely descriptive of a product are not distinctive," but may acquire distinctiveness through a "secondary meaning."  Id.

If a mark imparts information directly then it is considered descriptive.  See Anheuser-Busch Inc. v. Stroh Brewery Co., 750 F.2d 631, 641 (8th Cir. 1984) (citations omitted).  On the other hand, if the mark stands for an idea that "'requires some operation of imagination to connect it with the goods, it is suggestive.'"  Id. (quoting In re Abcor Dev. Corp., 588 F.2d 811, 814 (C.C.P.A. 1978)); see also In re Tennis in the Round Inc., 199 U.S.P.Q. 496, 498 (T.T.A.B. 1978) ("if one must exercise mature thought or follow a multi-stage reasoning process in order to determine what product or service characteristics the term indicates, the term is suggestive rather than merely descriptive").  A determination of the descriptiveness of a mark is determined from the standpoint of the average purchaser.  Anheuser-Busch Inc., 750 F.2d at 641 (citing In re Abcor Dev. Corp., 588 F.2d at 814).

Outcomes asserts that the mark "Encounter" is used by Outcomes to denote the systems and services it provides related to facilitating the provision of MTM services by healthcare plan providers to insureds.  Outcomes asserts that services covered by a healthcare plan are provided to an insured by a pharmacist who has contracted with Outcomes to participate and who has been trained to use Outcomes' MTM program.  The pharmacists use a form Outcomes has entitled "Outcomes Encounter Program Documentation Form" to document the services provided to the insured and to submit a claim for payment for services rendered.   Outcomes argues that the

"Encounter" mark, therefore, is not used to deliver services to the insured nor in direct connection with the insured but is instead used in association with activities undertaken by the pharmacists, which are only peripheral to the meeting between the pharmacist and the insured. Outcomes explains that these peripheral activities include recording an action taken, completing the Encounter form, submitting the claim to Outcomes, and being paid for services rendered. Outcomes concludes that it is therefore an arbitrary or fanciful mark entitled to the broadest protection.

Defendants maintain that the word "encounter" is used throughout the medical field to describe a meeting between a medical professional and a patient and that Outcomes is using the term in the same manner as everyone else in the field and thus cannot claim any special rights, let alone trademark rights, in this generic term. Defendants cite to numerous medical and pharmaceutical publications, in addition to widely circulated newspapers such at the New York Times and the Washington Post, all which include articles using the term "encounter" to describe a meeting between a medical professional and a patient. Defendants further assert that "Outcomes" would be Outcomes' mark, not the term "encounter". Sharman Stephens also testified regarding routine government surveys in this area which record the number of patient encounters.

The mark "Encounter" is most akin to a generic mark. Although Outcomes attempts to portray its use of the term "Encounter" as being wholly unrelated to a pharmacist meeting with a patient, the forms are the documentation of that meeting. With regard to prescription information, the Outcomes Encounter Program Documentation Form Instructions For Use states, "The information in this area reflects the primary drug involved in the encounter being billed. If the encounter involves a change in therapy from one agent to another, the dispensed prescription

information is entered here. . . .  If the encounter involves a change in therapy from one agent to

another, the initial prescription information is entered here."  The instructions for use further

state that with regard to Encounter Documentation, Encounter Documentation must include

(1) indication for service (the reason for the service; an indication of what type of code describes

the encounter performed); (2) professional service (the action taken; an indication of what action

code corresponds with the reason code); and (3) the outcome of service (the result; the result

code is to correspond with the reason and action code).  The instructions also specifically state,

"A brief explanation describing what occurred during an encounter involving a pharmacist and a

prescriber is mandatory."  Outcomes' own repeated use of the term "encounter" to describe the

pharmacist/patient interaction in its Encounter Program Provider Procedure Guide is a use

consistent with Defendants' assertion that the term "encounter" is frequently used in the medical

community to describe the patient/medical professional meeting.

　　　　"[T]he determination whether a mark is descriptive or suggestive cannot be made in a

vacuum; it is necessary to surmise the mental processes of those in the marketplace at whom the

mark is directed."  Thompson Medical Co., Inc. v. Pfizer Inc., 753 F.2d 208, 213 (2d Cir. 1985).

The term "Encounter" as used by both parties is directed specifically towards pharmacists who

would be utilizing MTM services.  Given the common use of the term "encounter" in the

medical community, it is a challenge to conclude that using the term "encounter" in connection

with its forms that pharmacists are to complete to document the patient/pharmacist meeting

required much, if any, imagination.  The Court views the mark as neither fanciful nor arbitrary.

The term "Encounter" as used in this context is thus a generic term used in the medical

community to refer to the patient/medical professional meeting, and the Court concludes on the

current record the "Encounter" mark is a generic mark.

Even if the Court were to conclude the mark is something more than generic, it would deem the mark nothing more than a descriptive mark that conveys the nature of the documentation the forms require. Descriptive marks can become distinctive if they have acquired a secondary meaning. Microware Sys. Corp., 126 F. Supp. 2d at 1213. By acquiring a secondary meaning, a descriptive mark becomes entitled to trademark protection. Id. "A descriptive mark may acquire secondary meaning if it has become so associated with the product that it identifies the source of the product and distinguishes the product from those of others." Id.; see Cellular Sales, Inc., 942 F.2d at 486 ("Secondary meaning refers to a mark that 'has become distinctive of the applicant's goods in commerce, i.e., to a mark that consumers associate with a product or distributor rather than with the product itself.'") (quoting Best Buy Warehouse v. Best Buy Co., 920 F.2d 536, 537 (8th Cir. 1990)). Outcomes bears the burden of establishing the mark has a secondary meaning. Iowa Paint Mfg. Co. v. Hirshfield's Paint Mfg. Inc., 296 F. Supp. 2d 983, 990 (S.D. Iowa 2003).

In examining whether a secondary meaning has been established, the Court considers "whether in the consumer's mind the mark denotes a single thing coming from a single source." Co-Rect Prods., Inc., 780 F.2d 1324, 1330 (8th Cir. 1985) (quoting Security Ctr., Ltd. v. First Nat'l Security Ctrs., 750 F.2d 1295, 1301 (5th Cir. 1985)) (quotations omitted). Pharmacists are obviously aware MTM services can be provided by more than one company. The use in which Outcomes employs the term "Encounter" merely serves as a term contained in guides, manuals, and forms pharmacists must complete to document their meetings and actions with regards to patients, the same context in which CCRX employs the term.

In support of its assertion that the mark "Encounter" has a secondary meaning, Outcomes states that is has spent considerable effort and funds to establish such secondary meaning and

that it has been continuously using the mark "Encounter" in commerce since at least 1999 in association with services marketed and provided to pharmacies and drug plan providers related to MTM.

The only evidence Outcomes offers to support its assertion that the term "Encounter" has obtained a secondary meaning is the affidavit of Halterman.  "More is needed to establish the necessary consumer association than merely the self-serving testimony of the plaintiff that some of his customers were confused."  Co-Rect Prods., Inc., 780 F.2d at 1333.  Further, continuous use of a mark, in and of itself, is insufficient to establish a secondary meaning exists.  Ark Plas Prods., Inc. v. Value Plastics, Inc., 913 F. Supp. 1246, 1256 (W.D. Ark. 1996).  Based on all of the foregoing, even if the Court were to find the term "Encounter" was descriptive, the current record does not establish that a secondary meaning to that term, as it is used by Outcomes, exists.

### B.    Likelihood of Confusion.

> When assessing the likelihood of confusion, courts consider all the circum-
> stances, which include relevant factors like the established trademark's
> strength (marketplace recognition value), the similarity of the marks, the
> competitive closeness of the products on which the marks are placed, the
> alleged infringer's intent to pass off its goods as those of the trademark
> holder, incidents of actual consumer confusion, and the degree of care the
> trademark holder's potential customers are likely to exercise.

Id. at 369-370.  When deciding whether there is a likelihood of confusion, "[e]ach factor must be considered and excessive weight should not be given to any one factor to the exclusion of others."  Life Techs., Inc. v. Gibbco Scientific, Inc., 826 F.2d 775, 776 (8th Cir. 1987), disagreed with on other grounds by ConAgra, Inc. v. George A. Hormel, & Co., 990 F.2d 368, 371 (8th Cir. 1993) (citing Calvin Klein Cosmetics Corp., 815 F.2d at 504).

**1.   Strength of Mark.**

"Generally speaking, 'strong' marks are afforded broad protection; 'weak' ones get limited protection."  Microware Sys. Corp., 126 F. Supp. 2d at 1211.  This principle applies to all trademarks, regardless of whether they are registered or considered incontestible.  See id. (citing General Mills, 824 F.2d at 626 (citing Abercrombie & Fitch Co. v. Hunting World, Inc., 537 F.2d 4, 12-13 (2d Cir. 1976))).  "Generally, the strength of a mark depends on two factors – the distinctiveness of the mark and the extent to which the mark is recognized by the relevant consumer class."  Aveda Corp., 706 F. Supp. at 1428 (citing 2 McCarthy, Trademarks and Unfair Competition 2d § 11:1).

"Even if a mark is valid and protectible, it may be so weak that the public is not likely to be confused by the use of a similar mark on other goods and services."  See Washington Speakers Bureau, Inc. v. Leading Auths., Inc., 33 F. Supp. 2d 488, 497 (E.D. Va. 1999).  "Determining that a mark is weak means that consumer confusion has been found unlikely because the mark's components are so widely used that the public can easily distinguish slight differences in the marks, even if the goods are related."  General Mills, 824 F.2d at 626.

"Whether a mark is entitled to trademark protection is initially approached by categorizing the mark . . . ."  General Mills, 824 F.2d at 625.  This process of categorization is also helpful in determining the strength and distinctiveness of a mark.  As discussed above, the mark is most likely generic, but at most, a descriptive mark with no secondary meaning.  The mark is thus weak and entitled to limited protection.

**2.   Similarity Between Marks.**

A court "must evaluate the impression that each mark in its entirety is likely to have on a purchaser exercising the attention usually given by purchasers of such products."  Duluth News-Tribune, 84 F.3d at 1097 (citing General Mills, 824 F.2d at 627).  "The use of identical, even

dominant, words in common does not automatically mean that two marks are similar." General Mills, 824 F.2d at 627.  However, exact similitude of the two marks is not required for a finding of likelihood of confusion.  See Washington Speakers Bureau, Inc., 33 F. Supp. 2d at 497 ("absolute identity is not necessary for infringement").  In fact, "all that is necessary is enough similarity between the marks to confuse consumers." Id.; see, e.g., David Sherman Corp., 340 F.2d at 380 ("Some dissimilarity in form and color is not conclusive against infringement.").

"[I]n analyzing the similarities of sight, sound, and meaning between two marks, a court must look to the overall impression created by the marks and not merely compare individual features." General Mills, 824 F.2d at 627.  "In fact, the whole point of the inquiry turns on whether the 'overall impression' created by the marks are such that a likelihood of consumer confusion will result." Microware Sys. Corp., 126 F. Supp. 2d at 1214 (citing General Mills, 824 F.2d at 627).

Therefore, the Court will "consider the marks' visual, aural, and definitional attributes and compare the trade dress of the products in determining whether the total effect conveyed by the two marks is confusingly similar." Luigiano's, Inc. v. Stouffer Corp., 170 F.3d 827, 830 (8th Cir. 1999).  "However, caution should be exercised to avoid putting too much stock in a subjective inspection done in-chambers that is devoid of market characteristics." Calvin Klein Cosmetics Corp., 815 F.2d at 504 (citing Beer Nuts, Inc. v. Clover Club Foods Co., 711 F.2d 934, 941-42 (10th Cir. 1983)); see also Wynn Oil Co. v. Thomas, 839 F.2d 1183, 1187 (6th Cir. 1988) (finding "side-by-side" comparison is not the test to determine similarity) (quoting Levi Strauss & Co. v. Blue Bell, Inc., 632 F.2d 817, 822 (9th Cir. 1980)); James Burrough Ltd. v. Sign of the Beefeater, Inc., 540 F.2d 266, 275 (7th Cir. 1976) (finding "side-by-side" comparison is not the test to determine similarity particularly when the consuming public will never have the opportunity for such a comparison).

Instead, a court "must attempt to recreate the conditions in which buying decisions are made, and . . . what a reasonable purchaser in market conditions would do." Calvin Klein Cosmetics Corp., 815 F.2d at 504; see also James Burrough Ltd., 540 F.2d at 275.  Where the public does not encounter the marks together, "it is inappropriate to focus on minor stylistic differences in determining the likelihood of confusion caused by the defendant's use of the allegedly infringing name." Int'l Kennel Club of Chicago, Inc. v. Mighty Star, Inc., 846 F.2d 1079, 1088 (7th Cir. 1988) (citing Sun-Fun Prods., Inc. v. Suntan Research & Dev., Inc., 656 F.2d 186 (5th Cir. 1981) ("the inability to compare the [marks] side-by-side and observe the precise difference in appearance may increase the likelihood of confusion.")).

"Where the products are closely related, less similarity of the trademarks is necessary to support a finding of infringement." Squirtco v. Seven-Up Co., 628 F.2d 1086, 1091 (8th Cir. 1980); see also Century 21 Real Estate Corp. v. Century Life of America, 970 F.2d 874, 877 (Fed. Cir. 1992) ("When marks would appear on virtually identical goods or services, the degree of similarity necessary to support a conclusion of likely confusion declines.") (citations omitted). Furthermore, where "marks use identical language to sell a nearly identical service, the likeli-hood of confusion must be considered great." Wynn Oil Co., 839 F.2d at 1190-91.

Both Outcomes and CCRX use the term "encounter" in a generic sense to describe the patient/medical profession meeting.  Although the customary use of the word "encounter" in the medical profession makes it difficult to classify that term as a protectable mark to which Outcomes would have exclusive rights, an examination of the record reveals that both parties are using the term "encounter" in the same way, to describe the same phenomenon, i.e., a patient/ medical professional meeting.

### 3.  Degree of Competition/Competitive Proximity.

This factor is important in determining whether consumers will be confused as to the source of the product.  A high competitive proximity in location and product type may serve to

37

increase the likelihood a purchaser could believe the products come from or are affiliated with the wrong source.  See, e.g., Wynn Oil Co., 839 F.2d at 1187 (finding consumer could easily assume producer of car wash products had expanded into car wash business).  There is no dispute that Outcomes and CCRX are direct competitors in providing face-to-face MTM services across the United States.  The degree of competition, due to the fact they are the only face-to-face MTM providers, weighs in favor of Outcomes.

### 4.  Intent of Alleged Infringer.

The intent of the alleged infringer to "pass off" its product as that of another serves to raise an inference of the likelihood of confusion.  Squirtco, 628 F.2d at 1091.  This intent is not, however, a required element for a finding of infringement.  Id.  While there is no evidence that CCRX had a predatory intent in using the term "Encounter" in its own MTM services platform, the Court should recognize that the adoption of a similar mark may lead to an inference of an intent to "pass off," particularly when there is a prior relationship.  Beer Nuts, Inc., 805 F.2d at 927.  Under the circumstances of this case, and based upon the commonly accepted use of the term "encounter" in the medical profession, the Court cannot conclude on this record that CCRX used this term in an attempt to lead potential customers to believe that its MTM services were one in the same as those provided by Outcomes.

### 5.  Actual Confusion.

"'When determining whether there exists a likelihood of confusion, weight is given to the number and extent of instances of actual confusion."  Duluth News-Tribune, 84 F.3d at 1098 (quoting Life Techs., Inc., 826 F.2d at 777).  This is because "[e]vidence of actual confusion is undoubtedly the best evidence of likelihood of confusion."  Wynn Oil Co., 839 F.2d at 1188.

The absence of actual confusion has been considered an important factor.  David Sherman Corp., 340 F.2d at 380; cf. Wynn Oil Co., 839 F.2d at 1188 ("it does not follow that lack of evidence of actual confusion should be a significant factor").  Proof of actual confusion,

however, "is not essential to a finding of trademark infringement." Squirtco, 628 F.2d at 1091.
In fact, "[t]he plaintiff is not required to prove any instances of actual confusion," Aveda Corp.,
706 F. Supp. at 1430 (citing E. Remy Martin & Co., S.A. v. Shaw-Ross Int'l Imports, Inc., 756
F.2d 1525 (11th Cir. 1986), and David Sherman Corp., 340 F.2d 377)), as clear and substantial
proof of actual confusion is difficult to produce. See Wynn Oil Co., 839 F.2d at 1188 (quoting
Bandag, Inc. v. Al Bolser's Tire Stores, Inc., 750 F.2d 903, 914 (Fed. Cir. 1984)).

Outcomes asserts that it has been contacted by at least one pharmacist who expressed
confusion regarding the source of the system offered by Community MTM, based on the use of
"Encounter" by CCRX/Community MTM. As noted by Defendants, and borne out in the record,
this instance of confusion is evidenced solely by a statement included in Halterman's affidavit,
which states that at least one pharmacist "has expressed confusion to me over the similar
marking used by Outcomes and CCRX/Community MTM, including the use of the term
ENCOUNTER to identify certain proprietary guides and services." Based upon the current lack
of evidence in the record to demonstrate there is actual confusion between the MTM services
provided by Outcomes and CCRX, the likelihood of confusion analysis favors Defendants.

### 6. Degree of Care/Sophistication of Buyers.

When the buying class is made up exclusively of professional, commercial purchasers, it
is presumed that this type of purchaser is the relevant class to consider. See, e.g., Arrow
Fastener Co., Inc. v. Stanley Works, 59 F.3d 384, 398-99 (2d Cir. 1995) (finding sophisticated
purchaser was the proper standard); Astra Pharm. Prods., Inc. v. Beckman Instruments, Inc., 718
F.2d 1201, 1206-07 (1st Cir. 1983) (finding relevant inquiry is "the sophistication of the class of
prospective purchasers of the subject products" and purchasers here were highly sophisticated);
CMM Cable Rep., Inc. v. Ocean Coast Props., Inc., 888 F. Supp. 192, 200 (D. Me. 1995) aff'd
97 F.3d 1504 (1st Cir. 1996) (finding sophisticated commercial purchaser was the proper stan-
dard); 3 J. McCarthy, Trademarks and Unfair Competition § 23.100 (4th ed. 2003). Purchasers

of this type are usually more sophisticated and therefore less likely to be confused than the ordinary consumer.  Astra Pharm. Prods., Inc., 718 F.2d at 1206-07.

The MTM services at issue here involve hundreds of thousands of dollars, and at least partially involve sophisticated parties; members of the pharmacy profession engaging in consumer transactions involving professional services, and entities engaged in prescription drug plans requiring MTM services.  The current record fails to demonstrate that parties in this arena would confuse MTM services using the term "Encounter" offered by Defendants as the same product as that being offered by Outcomes.

## II.      Irreparable Harm

"In an action for trademark infringement, 'the only irreparable harm the plaintiff need show is that there is a likelihood of confusion and, therefore, infringement of its mark.'"  Aveda Corp., 706 F. Supp. at 1431 (quoting Penthouse Int'l, Ltd. v. Penthouse Party & Travel Club, Ltd., 184 U.S.P.Q. 479, 481 (E.D. Mich. 1974)).  This is in part because trademark infringement damages are by their nature difficult to quantify and remedy.  See General Mills, 824 F.2d at 625 ("Since a trademark represents intangible assets such as reputation and goodwill, a showing of irreparable injury can be satisfied if it appears that [movant] can demonstrate a likelihood of consumer confusion.").

There is no requirement that the plaintiff suffer economic disadvantage or financial harm. James Burrough Ltd., 540 F.2d at 275.  "Though economic harm per se is not required, . . . the owner of the mark is damaged by a later use of a similar mark which places the owner's reputation beyond its control, though no loss in business is shown."  Id. at 276; see also Citibank N.A. v. City Bank of San Francisco, 206 U.S.P.Q. 997, 1007 (N.D. Cal. 1980) ("Loss of business is not the test of irreparable injury in motions for preliminary injunctions against the use of a trademark.  The fact that Plaintiff has had the symbol of its reputation placed in the hands of another is irreparable injury.").

40

In a trademark infringement action, damage to reputation and goodwill are often present. This may come as a result of consumer confusion over the source of goods of inferior quality. By improperly attributing the source of the goods to the plaintiff, the plaintiff's business reputation can be severely damaged.  See Hills Bros. Coffee, Inc. v. Hills Supermarkets, Inc., 428 F.2d 379, 381 (2d Cir. 1970) (finding that "[u]nless a preliminary injunction is issued . . ., the appellant would suffer the prospect of serious dilution of its mark by purchasers buying appellee's coffee by mistake . . ., thereby placing [appellant's] sales and reputation in danger pending the final outcome of the trial.").  While such an injury is real, it is often difficult to measure in money damages.  As the Second Circuit stated,

> When there is, then, such high probability of confusion, injury irreparable in the sense that it may not be fully compensable in damages almost inevitably follows.  While an injured plaintiff would be entitled to recover the profits on the infringing items, this is often difficult to determine; moreover, a defendant may have failed to earn profits because of the poor quality of its product or its own inefficiency.  Indeed, confusion may cause purchasers to refrain from buying either product and to turn to those of other competitors.  Yet to prove the loss of sales due to infringement is also notoriously difficult.  Furthermore, if an infringer's product is of poor quality, or simply not worth the price, a more lasting but not readily measurable injury may be inflicted on the plaintiff's reputation in the market.

Omega Importing Corp. v. Petri-Kine Camera Co., 451 F.2d 1190, 1195 (2d Cir. 1971) (reversing order denying preliminary injunction) (internal citations omitted).  However, "only a clear showing of confusion generates the presumption of irreparable harm."  Minn. Mining & Mfg. Co., 943 F. Supp. at 1133.

Thus, "courts may also consider the potential loss of control over the quality of plaintiff's product and the risk of damage to a plaintiff's reputation and trademark from the continued use of an infringing mark."  Id.  This harm must, however, be more then merely speculative.  See United Indus. Corp., 140 F.3d at 1184 ("irreparable harm cannot be presumed where, as here, plaintiff has not established any prospect of success on the merits."); Sports Design & Dev., Inc.,

41

871 F. Supp. at 1164 ("'Possible or speculative harm is not enough.'") (quoting <u>Bloom v. O'Brien</u>, 841 F. Supp. 277, 279 (D. Minn. 1993)).  Moreover, in the absence of a likelihood of confusion, it is extremely difficult to make a finding of irreparable harm, particularly where there is no showing of economic or financial loss.  <u>See</u> <u>Microware Sys. Corp.</u>, 126 F. Supp. 2d at 1218 (citing <u>United Indus. Corp.</u>, 140 F.3d at 1183-84).

As discussed above, the likelihood of confusion is speculative at best, and Outcomes has not made a showing of any economic or financial loss that it has suffered to date due to the CCRX use of the term "encounter".  The Court therefore concludes that Outcomes has not established it will suffer irreparable harm in the absence of injunctive relief at this stage of the proceeding.

**III.     Balance of Harms.**

"Where the moving party has made a substantial investment developing its trademark relative to the nonmoving party's investment in the allegedly infringing mark, the courts gener-ally find that the moving party's hardship outweighs that of the nonmoving party."  <u>Aveda Corp.</u>, 706 F. Supp. at 1431 (citations omitted).  The potential loss to the moving party may include loss of trade, sales, reputation, and goodwill, some of which may never be remedied with money damages.  <u>Id.</u>; <u>Minn. Mining & Mfg. Co.</u>, 943 F. Supp. at 1133.  The court will also look at size of the parties' relative investment.  <u>Aveda Corp.</u>, 706 F. Supp. at 1431.

Outcomes asserts that the potential harm that the requested preliminary injunction would cause to CCRX and Community MTM is quite small compared to the harm to Outcomes.  Outcomes notes that it has been within only the last few months in which CCRX and Community MTM began using the mark, thus they have spent only a fraction of what Outcomes has spent developing the mark over the past five years. Outcomes further points out that CCRX uses the Community MTM web based system to facilitate services, thus requiring CCRX and Community

MTM to refrain from using the mark "Encounter" would not require a product recall or even a significant reprinting of hard-copy material.

Defendants argue that they would be harmed by a preliminary injunction prohibiting their use of the term "Encounter" because they would be required to update their website and programming to remove references to the word "Encounter".  Although Defendants acknowledge that the cost of removing this common word in and of itself may not be substantial, Defendants assert that the burden of continuing to avoid use of the term would be significant.

Defendants' inability to use a term so commonly used in the medical industry to describe a patient/medical professional meeting would be burdensome; however, the relative cost to Defendant of removing the term "Encounter" from its business would not be substantial, due to the fact that Defendants are web-based.  To the extent Outcomes would be able to establish irreparable harm, the balance of harms would not weigh in Defendants' favor, due to the relative ease in which CCRX could eliminate its use of the term "encounter" from its product pending final resolution of Outcomes trademark claims.  However, because Outcomes has failed to establish either success on the merits or irreparable harm, this factor is of little determinative value.

## IV.   Public Interest.

"The public has an interest in protecting the integrity of trademarks and trade dress."  Id. (citations omitted).  This factor focuses on "the consumer's right not to be confused as to the origin or source of the goods."  Calvin Klein Cosmetics Corp., 815 F.2d at 505.  More specifically, "[i]n the context of trademark infringement, this factor involves the balancing of the interest in protecting the public from confusion or deception with the interest in a competitive market."  Aveda Corp., 706 F. Supp. at 1431-32 (citing 2 McCarthy, Trademarks and Unfair Competition 2d § 30:21); see also Sports Design & Dev., Inc., 871 F. Supp. at 1165 (finding this

factor involves balancing interest in protecting public from confusion with interest of facilitating a competitive market).

Outcomes contends that the public interest is more acute in this case because of the prior relationship between the parties, where Outcomes provided its services in conjunction with the CCRX discount card plan.  Due to that prior relationship, pharmacists treating patients who participated in that plan would be familiar with seeing the "Encounter" mark associated with CCRX.  Outcomes maintains that the factor of public interest greatly weighs in its favor.

Defendants argues that a preliminary injunction would harm the public interest because it would effectively remove a common term from the public lexicon and would be counter to the purpose of the Lanham Act.

Injunctive relief would not necessarily remove the term "encounter" from the public lexicon, but it would certainly remove it from CCRX use.  It is in the public's interest for medical professionals, and those providing services to medical professionals, to be able to use standardized, commonly accepted language and terms within the industry.  The public interest factor does not weigh in favor of granting injunctive relief.

**CONCLUSION.**

The term "Encounter" as used is classified as a generic mark and thus is entitled to limited protection.  Given the common use of the term "encounter" in the medical field, the absence of evidence of instances of actual confusion, the lack of a demonstrated predatory intent on behalf of Defendants, and the relative sophistication of the consumers of MTM services, there is not a strong likelihood of confusion, and the Court therefore concludes Outcomes has not established a likelihood of success on the merits of its trademark infringement claims.  Outcomes has failed to establish irreparable harm should Defendants be allowed to continue using the term "encounter" in connection with their own MTM services, and the balance of harms and public

interest factors do not weigh in favor of preliminary injunctive relief.  Based upon a considera-tion of all the factors relevant to issuing a preliminary injunction in a trademark infringement action, the Court concludes that an injunction should not issue.

**FINAL CONCLUSION**

After balancing the four factors relevant to considering a motion for preliminary injunc-tion pertaining to Outcomes pending claims for breach of contract, misappropriation of trade secrets, and trademark infringement, the Court concludes  Plaintiff's Motion for a Preliminary Injunction (Clerk's No. 60) must be **denied.**

**IT IS SO ORDERED.**

Dated this 22nd day of December, 2006.

JAMES E. GRITZNER, JUDGE
UNITED STATES DISTRICT COURT